The judgment of the district court is, therefore, AFFIRMED.

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ralph Medina ARCE, Tony Coronado and Carlos Roque Pina, Defendants–Appellants.**

No. 79–5539.

United States Court of Appeals, Fifth Circuit. Unit A

Dec. 29, 1980.

Rehearing Denied Feb. 3, 1981.

David C. Kellum, San Antonio, Tex. (Court-appointed), for Arce.

Shelton E. Padgett, San Antonio, Tex. (Court-appointed), for Coronado.

John N. Mastin, San Antonio, Tex. (Court-appointed), for Pina.

Jamie C. Boyd, U. S. Atty., LeRoy Morgan Jahn, W. Ray Jahn, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before COLEMAN, Chief Judge, RUBIN and WILLIAMS, Circuit Judges.

COLEMAN, Chief Judge.

In company with Sylvia Coronado and Alvin Valinzuela, Ralph Medina Arce, Tony Coronado, and Carlos Roque Pina were convicted of (1) conspiracy to knowingly possess stolen mail; (2) aiding and abetting possession of a stolen check which had been mailed to Miguel Hernandez; (3) aiding and abetting possession of a stolen check which had been mailed to Tomas Valdez; and (4)

aiding and abetting possession of a stolen check which had been mailed to Elijio Aguillon, in violation of 18 U.S.C.A. §§ 371, 1708 (1976).[1] Arce was sentenced to a term of 10 years, Coronado to a 20-year term, and Pina to an 8-year term.[2]

Reversal is sought on the following grounds:

(1) The evidence is insufficient to support the convictions in that the government failed to establish beyond a reasonable doubt either a connection among the appellants or possession of or control over the checks by any appellant (Arce, Coronado, and Pina);

(2) The District Court erred in denying the motion to suppress the evidence obtained in a search based on a search warrant in that:

(a) the affidavit failed to provide information concerning an informant's credibility or the reliability of her information (Pina);

(b) the affidavit contained knowing and intentional misrepresentations made with reckless disregard for the truth (Coronado and Pina; Arce conceded both points on oral argument);

(3) The arrest of Coronado was based upon mere suspicion, not probable cause (Coronado);

(4) The District Court erred in not granting a mistrial based upon the government's attempt to introduce four additional stolen checks (Coronado);

(5) Comments by the trial judge concerning Coronado's lack of remorse during sentencing constituted a Fifth Amendment violation, and the resulting maximum sentence imposed on him was an abuse of judicial discretion (Coronado).

Finding these attacks to be without merit, we affirm the convictions in each and every particular.

## I

### Facts

Viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and resolving all reasonable inferences and credibility choices in support of the jury verdict, *United States v. Slone*, 601 F.2d 800, 803 (5th Cir. 1979); *United States v. Henderson*, 588 F.2d 157, 161 (5th Cir.), *cert. denied*, 440 U.S. 975, 99 S.Ct. 1544, 59 L.Ed.2d 794 (1979), the facts will now be recited.

On June 1, 1979, sometime between 10 and 11 o'clock, a. m., in San Antonio, Texas, a postal jeep, left unattended while the letter carrier delivered mail door-to-door, was burglarized. Thus taken were between

1. 18 U.S.C. § 371 (1976) provides in part:

 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both. 18 U.S.C. § 1708 (1976) provides in part:

 Whoever buys, receives, or conceals, or unlawfully has in his possession, any letter, postal card, package, bag, or mail, or any article or thing contained therein, which has been so stolen, taken, embezzled, or abstracted, as herein described, knowing the same to have been stolen, taken, embezzled, or abstracted—

 Shall be fined not more than $2,000 or imprisoned not more than five years, or both. Although not mentioned in the indictment, 18 U.S.C. § 2(a) (1976) states a law of principals:

 Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

2. Arce was sentenced five years on Count One of the indictment, five years on Count Two, running concurrently with Count One, five years on Count Three, running consecutively with Count One, and five years on Count Four, running concurrently with Count Three. His total sentence is 10 years.

 Coronado was sentenced five years on each count with all sentences running consecutively. Therefore, his total sentence is 20 years.

 Pina was sentenced four years on Count One, four years on Count Two, running concurrently with Count One, four years on Count Three, running consecutively with Count One, and four years on Count Four, running concurrently with Count Three. Thus, his total sentence is 8 years.

250 and 300 pieces of mail destined for addressees from 200 to 600 East Woodlawn Street, San Antonio. Social Security checks were in the mail for delivery that day and addressees included Miguel A. Hernandez, 315 East Woodlawn Street; Elijio H. Aguillon, 305 East Woodlawn Street; and Tomas A. Valdez, 418 East Woodlawn Street. They did not get the checks.

No witnesses were found, or adduced, who saw any of the appellants break into the postal jeep, or take anything from it, or in actual physical possession of any government checks. So, for a time, the invaders had brought off a "perfect" crime, but they had one more river to cross. The checks were worthless unless, in some manner, they could be cashed.

Michael Jordan, special agent for the United States Secret Service, learned of the burglary of the postal jeep. Right straight, he began calling San Antonio producers of photographic identification cards, asking them to watch for anything involving addresses from 200–600 East Woodlawn. The trap was that quickly and that easily set. He talked to Mrs. Sam Grillo, co–owner of Master Arts Studio, 148 East Houston Street. He found out that already there had been two successful visits in and out of the trap. Mrs. Grillo checked those cards which had been sold earlier that day and found that two people had used addresses within the stated area. One card had been issued to Marcelino Funentes, 402 East Woodlawn. Jordan asked Mrs. Grillo to call him if anyone else came in using an address from 200 to 600 East Woodlawn.

Right off the bat, about fifteen minutes later, the defendant Pina came in and filed an identification card application in the name of Elijio H. Aguillon, 305 East Woodlawn Street. Mrs. Grillo called Jordan and told him of this development. Jordan responded he would come to the studio. He instructed her to detain Pina and to look outside for a parked car since normally in a situation of this sort there would be someone outside waiting for the visitor to emerge.

Within 10 to 15 minutes, Arce and Valenzuela came into the studio. Arce filled out an application in the name of Miguel A. Hernandez, 315 East Woodlawn. Valenzuela filled an application in the name of Tomas A. Valdez, 418 East Woodlawn.

Upon looking outside, Mrs. Grillo saw three people on the front seat of a brown Pontiac parked on the opposite side of the street about one–half block from the studio. Notably, it was parked in a zone where from 4–6 p. m. no parking was allowed. Mrs. Grillo walked across, looked at the license plate, returned upstairs, and wrote the license number down. The time was approximately 4 p. m. By then, Arce, Pina, and Valenzuela had been in the studio, occupying the trap, for over an hour. Grillo relayed the license number to the postal inspector who had called her.

During this time a young boy came in and, when asked if he needed help, said that he wanted to talk with someone in the waiting room; Grillo thought, but was not sure, that he talked with Pina. Grillo never saw the suspects converse among themselves, but during the time they were waiting, she helped other customers, checked the area outside for a car, walked to the post office so that she could observe the license number, and talked to the authorities on the telephone. Arce left and walked downstairs for approximately five minutes, but he returned when Grillo called him back and asked a question.

Jordan, the seasoned trap setter, arrived on the scene about 4 p. m. After parking his car, he twice walked past the brown Pontiac, which had moved closer to the studio but was still on the opposite side of street, being the only car parked in the restricted zone. He saw three people, two men and a woman, sitting on the front seat in such a way that they could maintain visual contact with the studio entrance. They were looking directly at the entrance. Jordan then took up surveillance directly across the street in the lobby of the Texas Theater, from whence he could see both the parked car and the studio entrance. He saw Arce come down the stairs, look to-

wards the Pontiac, and nod his head. Arce remained on the stair landing approximately 30 minutes, maintaining visual contact with the car all during that time. Jordan saw Arce go back up the stairs one time and also saw David Flores, a juvenile, go up and down the stairs twice during this period. During this time period, there was rain of varying intensity, sometimes heavy enough for windshield wipers, sometimes sprinkling or drizzling, and at other times none at all. Grillo said that it was sprinkling when she went to the post office; Jordan testified that during the 30 minutes he maintained surveillance the rain was not hard enough to cause people on the street to take cover.

At approximately 4:30 p. m., the Pontiac left the curb and merged into traffic moving east; simultaneously, Arce left the landing, also moving east, and appeared to be going toward the curb. Jordan jumped in front of the car which had stopped while trying to merge into the center lane in heavy traffic. Postal Inspector Casillas, who for about ten minutes had been parked behind the suspect vehicle, came from the rear of the vehicle and took out the driver, Tony Coronado. Jordan took out the other two—Sylvia Coronado, who had been sitting in the middle, and her brother, James Perez, a juvenile, who had been sitting in front of the glove compartment. Upon these developments, Arce reversed directions and headed away from the car, a very prudent maneuver could it have been successful. Jordan caught up with him at the studio entrance and took him to where the others were on the sidewalk. He then went upstairs to the identification card studio and arrested Pina and Valenzuela upon their being pointed out by Grillo. Flores was arrested also. Jordan observed that Perez had the name "Marcelino Funentes" written in ink on his hand.

All suspects were taken to the federal building, where they were put in a small room for 15–20 minutes. Sylvia asked James where the money was. He told her it was in his back pocket. Sylvia then took the money out of his pocket and put in her pocket. All were taken to a larger room.

Flores, who, like the Old Dog Trey, had been caught up because he was standing so close to the fire without realizing that there was one, testified that everybody was talking about some checks. Tony Coronado said to James that only three checks in the glove compartment would be found and told him to take the blame for them. Arce also told James to take the blame. Perez was not in an accommodating mood and refused to do so. Tony also asked Sylvia about the money, and she replied that it was in her pocket.

On an affidavit by Special Investigator James Rosinbaum, United States Postal Inspection Service, a search warrant was obtained. The search was conducted by Casillas and Rosinbaum while Jordan watched. He saw Casillas remove three envelopes from the glove compartment. The envelopes contained treasury checks payable to Miguel A. Hernandez, 315 East Woodlawn, Elijio H. Aguillon, 305 East Woodlawn, and Tomas A. Valdez, 418 East Woodlawn.

The checks found in the glove compartment were processed for fingerprints, but no identifiable fingerprints were found on the checks or the envelopes. The car was not processed for fingerprints. Casillas testified that if the checks were exposed to moisture or wetting agents, fingerprints would be washed off, and the ninhydrin process used to bring out the fingerprints would not pick up the fingerprints. The checks were wet when they were removed from the car.

A handwriting expert testified that, based on handwriting exemplars provided by Arce, Pina, and Valenzuela, Arce had written the identification card application and signed the identification card in the name of Miguel A. Hernandez, that Pina had written and signed similar documents using the name of Elijio H. Aguillon, and that Valenzuela had written the handprinted numbers on the application and card in the name of Tomas A. Valdez.

It was stipulated that the checks in question were prepared for mailing and were

mailed on May 30, 1979, from Kansas City, Kansas.

What it all comes down to is that these defendants were thoroughly trapped. Their only hope of escape—if there were a hope—is that maybe the constable, or possibly the prosecutor, blundered. We hold that there is no sound reason for hope.

█ We, of course, could take a journey, for the hundredth time or more, through the exhaustively mapped field of evidentiary sufficiency but this case offers no justification for it, much less a necessity for it.[3] We hold that any attack on the sufficiency of the evidence must fail.

█ A like appraisal must be visited upon the argument that Coronado's arrest was without probable cause, see *United States v. Preston*, 608 F.2d 626, 632 (5th Cir. 1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980).

## II

### Denial of Motion to Suppress

█ In allowing Pina to contest the search of the Pontiac, the District Court apparently relied on the "automatic standing" rule set forth in *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). *Jones* has now been overruled by *United States v. Salvucci*, —— U.S. ——, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), which held that possession of a seized good could not be used as a substitute for a finding that the owner of the good had a legitimate expectation of privacy in the area searched. Now, the appropriate inquiry is "not merely whether the defendant had a possessory interest in the items seized, but whether he had an expectation of privacy in the area searched." See, *United States v. Odum,* 625 F.2d 626, 628 (5th Cir. 1980). Under *Salvucci,* Pina had no standing to contest the search since he had no legitimate expectation of privacy in a car registered to someone else when he was not even a passenger in it when arrested.

█ The government concedes that Tony Coronado did have standing to challenge the search since he was driving the car when arrested. His challenge to the search is that the search warrant was obtained by the use of an affidavit which contained misrepresentations knowingly and intentionally made, or with a reckless disregard for the truth. The affidavit in question was prepared by Rosinbaum from information supplied by Jordan and Casillas.[4]

The challenged averments in the affidavit for the search warrant are

**3.** For the standard for reviewing the sufficiency of the evidence, see *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Malatesta,* 590 F.2d 1379, 1382 (5th Cir., *en banc*), *cert. denied,* 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979); *United States v. Odum,* 625 F.2d 626, 628 (5th Cir. 1980); *United States v. Forrest,* 620 F.2d 446, 450 (5th Cir. 1980); *United States v. Barrera,* 547 F.2d 1250, 1255 (5th Cir. 1977); *United States v. Fox,* 613 F.2d 99, 101 (5th Cir. 1980); *United States v. Davis,* 592 F.2d 1325, 1328 (5th Cir. 1979), *cert. denied,* 442 U.S. 946, 99 S.Ct. 2894, 61 L.Ed.2d 318 (1979); *United States v. Gonzales,* 617 F.2d 104, 106 (5th Cir. 1980). This does not, by any means, exhaust the list of cases in this field, but it is enough to cover the subject.

**4.** The body of the affidavit for a search warrant reads as follows:

I, James S. Rosinbaum, Special Investigator, U. S. Postal Inspection Service, have been employed by the Postal Inspection Service since 1973, do affirm that at approximately 11:00 a. m., June 1, 1979, a U. S. Postal Service vehicle parked at East Russell and North St. Mary's St., San Antonio, Texas, was broken into by breaking the right rear window. The vehicle contained mail for delivery in that general area. The vehicle was locked and unoccupied. All mail for the 200 through 600 block of East Woodlawn was stolen which included a large number of U. S. Treasury checks.

During routine investigation with ID card establishments in San Antonio, it was determined that two ID cards had been purchased from Mrs. Billie Grillo, Master Art Studio, 148 E. Houston, San Antonio, Texas, in the names of Marcelino Funetes, 402 E. Woodlawn and Francisco P. Romo, 243 E. Woodlawn. These persons were contacted and they verified that they were expecting a U. S. Treasury check on this date and did not receive one.

At approximately 3:30 p. m., Mrs. Billie Grillo, contacted SA Michael Jordan, U. S. Secret Service, and informed him that one of the

(1) The statement in paragraph 3 that Mrs. Grillo had informed Jordan at 3:30 p. m. "that one of the individuals who had previously purchased an ID card for an address on East Woodlawn was back attempting to purchase a second ID card," and

(2) The statement in paragraph 4 that Mrs. Grillo had identified "3 subjects in a 1970 Pontiac."

■ Mrs. Grillo had reported that "they are back," obviously referring to persons seeking cards for addresses in the specified street area. She did not say that they were, in fact, persons who individually had been there that morning. This variance was nothing more than an inaccuracy. It did not materially distort the actual fact that card seeking suspects were in her place of business and there is no dispute that these appellants were there exactly for the described purpose.

Indeed, Mrs. Grillo did not identify the occupants of the car *by name*, but she had seen the occupants, as had the surveilling agent. There can be no doubts that these persons were in the car. Finally, which within itself is enough, the defendant made no substantial preliminary showing that these inaccurate statements were knowingly and intentionally false or made with a reckless disregard for the truth, see *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

The attack on the validity of the search warrant is rejected.

### III

*Motion for Mistrial Based Upon Attempted Admission of Additional Stolen Checks*

On June 23, 1979, the previously mentioned Pontiac was repossessed. The person who had sold it to Sylvia Coronado consented to a search of the car. Four more treasury checks were found in the trunk of the car, wrapped in a blanket. None were addressed to any of the defendants. The government sought to introduce the checks into evidence. The jury heard nothing more than the exhibit numbers and the names of the respective payees. After objections by all defendants, a hearing was held outside the presence of the jury. The trial judge sustained the objections, as he said, "out of an abundance of caution." Record, Vol. 3, p. 187. Moreover, upon returning to the courtroom, the Court told the jury that he had sustained the objections "to the proffered exhibits 13, 14, 15 and 16" and "you are not to consider for any purpose any testimony that you have heard relative to those last four items." Record, Vol. 1, p. 189. A defense motion for a mistrial was denied. Only Tony Coronado urges on appeal that the District Court erred in denying this motion for a mistrial because the attempted admission was so prejudicial that a cautionary instruction to the jury could not cure the prejudice.

■ There was no error here. The jury heard nothing more than there were checks, described only by exhibit number and payee, and that the Judge had determined that these checks were not admissible in evidence, that the jury was not to consider what little it had heard about them. See, e. g., *United States v. Walker*, 621 F.2d 163, 168 (5th Cir. 1980); *United States v. Klein*, 546 F.2d 1259, 1263 (5th Cir. 1977).

### IV

*Coronado's Sentence*

■ In essence, Coronado claims that he received the maximum sentence because he

---

individuals who had previously purchased an ID card for an address on East Woodlawn was back attempting to purchase a second ID card.

Upon arrival, Billie Grillo identified 4 subjects who were in the store and 3 subjects in a 1970 Pontiac, 2–door bronze, bearing Texas license SRM 40, who were attempting to purchase ID cards.

All 7 subjects were placed under arrest by SA Michael Jordan and PI Charlie Casillas and asked to identify themselves. None of their identifications corresponded with the names and addresses on the ID cards they had purchased. Three of the subjects were sitting in the front seat of the vehicle when arrested.

refused to testify in his own behalf. The record simply does not support this contention. The trial judge based the sentence on Coronado's previous criminal record and his role as a leader in this criminal business.

 However, the imposition of consecutive sentences for aiding and abetting possession of three pieces of mail which obviously were stolen from the mail truck at the same time conflicts with *Williams v. United States*, 385 F.2d 46 (5th Cir. 1967). The *Williams* Court held that possession of various items of stolen mail which were in the defendant's possession as a result of one set of circumstances, that is, one theft, constitutes only one offense, and the defendant could be convicted of only one offense. 385 F.2d at 47. Nevertheless, consecutive sentences may be imposed for the conspiracy and the substantive offenses. *United States v. Baldarrama*, 566 F.2d 560, 570 (5th Cir.), *cert. denied*, 437 U.S. 906, 98 S.Ct. 3094, 57 L.Ed.2d 1136 (1978).

The government recognized this point in its brief and at oral argument. Coronado's counsel did not raise it in the District Court, in his brief, or at oral argument. Therefore, counsel for Coronado should file a Rule 35 motion on this ground for reduction of the sentence within 120 days after receipt of our mandate disposing of this appeal. Fed.R.Crim.Proc. 35, 18 U.S.C. (1976).

Arce's *pro se* motion for a reduction of sentence, which seems not to have been acted upon in the District Court, should have attention upon the receipt of our mandate.

### V

The other assignments of error have been carefully examined but do not justify discussion.

AFFIRMED.