**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Harold Allen PARKS and Harry Bruce Holloway, Defendants-Appellants.**

No. 79–5497.

United States Court of Appeals,
Fifth Circuit.

Aug. 20, 1982.

Gerald H. Goldstein, San Antonio, Tex., Raymond C. Caballero, El Paso, Tex., for Holloway.

Bruce R. Sternberg, Austin, Tex., for Parks.

LeRoy Morgan Jahn, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before COLEMAN, POLITZ and GARWOOD, Circuit Judges.

**1080**

GARWOOD, Circuit Judge:

Parks and Holloway appeal their convictions for possession of and conspiring to possess marihuana with intent to distribute, contrary to 21 U.S.C. §§ 841(a)(1) and 846. The case presents a number of potentially difficult Fourth Amendment issues. The basis for our decision, however, is rather narrow: Parks and Holloway failed to establish that *their* Fourth Amendment rights were violated.

## FACTS AND PROCEEDINGS BELOW

On March 21, 1979, an investigator for the Travis County District Attorney's Office obtained a warrant from a state district judge to install an electronic transponder (a "beeper") inside a twin-engine plane located at the airport in Austin, Texas. The investigator suspected that drug smugglers were using the plane. Later that night, an officer entered the plane and installed the beeper.[1] The warrant had a thirty-day time limit.

On April 20, 1979, the same investigator presented to the same state judge an affidavit requesting an extension for monitoring the beeper. The judge notarized the affidavit, but failed to issue a written extension.[2] Electronic surveillance of the plane was continued. On April 27, 1979, apparently in the morning, the agents received information from a monitoring station that the signal of a law enforcement beeper, whose source had flight characteristics fitting those of the plane in question, had been tracked in the air proceeding south into Mexico near Laredo. Agents then checked the Austin airport and found that the plane was absent. That evening Customs officials picked up the beeper signal from within Mexico and determined

that the plane was moving toward the United States. Agents in intercept aircraft, apparently aided by the beeper, thereafter located and followed the plane as it proceeded in the dark, without lights, toward a landing site on Horsehead Crossing Road in the Big Bend area of Texas. When one of the Customs agents observed a light flashing from the ground, he contacted the local sheriff's department for assistance. The suspect plane landed and Parks and Holloway were captured after fleeing the landing site in a pickup truck loaded with over half a ton of marihuana. No evidence was taken from the plane.

Holloway and Parks moved to suppress all the evidence seized at the time of their arrests. The trial court denied the motion and convicted both. They appealed and, pursuant to the motion of all parties, we remanded the case for a hearing to determine the "standing" of Parks and Holloway to contest the search and seizure of the evidence. The trial court ruled that neither had standing. Parks and Holloway appeal once more.

The only grounds for the requested suppression that were supported by either evidence or argument in the district court, and the only grounds urged on appeal, relate to the contention that the beeper was illegally maintained and monitored. No one questions that the officers had probable cause both to stop appellants as they fled in the pickup truck and to seize the marihuana, once the officers arrived on the scene. Locating the plane through the beeper obviously enabled the agents to make the arrests and seizure. Therefore, we can sustain neither appellant's conviction if the district court erred in denying their motion to suppress, since the alleged unconstitu-

1. The investigator had obtained a previous warrant from a federal magistrate in January. The beeper was removed, however, because the plane was being repaired at that time. Agents entered the aircraft on each occasion through the closed cargo hatch, which has a built-in lock. After the March installation, the agents did not again enter the plane until the arrests of appellants on April 27.

2. Apparently, the state judge granted an oral extension of the warrant. While we do not reach the merits of the validity of oral extensions, we strongly advise against reliance on them in the future. Appellants also assert that when the extension was requested the warrant had already expired, and that in any event there was no probable cause for the extension. We do not reach the merits of these contentions.

tional acts resulted in appellants' arrests and seizure of the marihuana.

Neither Holloway nor Parks testified at either of the suppression hearings.[3] On the night of their arrests both Parks and Holloway informed the agents that Holloway piloted the plane. Parks stated that he had served as the "ground crew," driving the truck from Austin to rendezvous with Holloway when he piloted the plane to the landing site, and carrying the airplane seats from near the Austin airport where "they had been stashed in the weeds." Parks also said the plane had been "staged" for the trip to Mexico at another airfield northwest of Austin and, after the seats were removed, loaded with fuel cans that had been purchased in Austin. Parks apparently did not disclose who removed the seats or loaded or staged the plane or acquired the fuel cans.

The government introduced evidence of the plane's registered ownership since 1969. Neither Parks nor Holloway ever had any documented, official interest in the plane. Its registered owner since 1977 was Wayne Roberson of Austin. However, other evidence showed the actual owner was Mikal Amuni, who customarily used various aliases. No evidence showed that either Parks or Holloway ever had any character of legal or proprietary interest in the plane, nor that Holloway had traveled in it other than on April 27, nor that Parks had ever done so. Except for a period of time from about February 2 to March 6, 1979, when it was being repaired in San Antonio and was then flown by Amuni to Oklahoma City for re-painting, agents had maintained fairly regular surveillance over the plane from late January until the events in question on April 27. At no time did the agents observe either Parks or Holloway. Nothing evidenced any relationship between Parks or Holloway and Amuni, or the present or any previous registered owner, or any of the other several individuals whom agents had observed in activities related to the plane during this period. During the surveillance period, the plane's curtains were pulled shut, the cargo door was closed, and the pilot's door was padlocked. The night of the arrests the agents found the cargo door open and a padlock, with a key in it, on the wing next to the pilot's door. Subsequent investigation revealed Holloway was from Antlers, Oklahoma and had an aircraft facility there. Parks and Holloway were given notice of forfeiture proceedings commenced against the plane subsequent to April 27, and the forfeiture receipt was sent to Holloway. Since April 27 no one has claimed any interest in the plane.

During the day on April 27 the agents learned that after the plane departed for Mexico, Amuni appeared at the Austin airport and, using the name Jim Waters, claimed that the aircraft had been stolen. However, no formal report of theft was ever filed. Amuni was then under investigation for possible marihuana smuggling and a formal report that the plane was stolen would have required his correct name.

An agent testified that when Parks was questioned following his arrest on April 27, he initially stated he and Holloway had stolen the plane. The agent then told Parks the plane had been reported stolen and "that we possibly would be filing charges on theft of the aircraft." Parks thereupon denied the plane was stolen and told the agents that "a few days before" April 27 he and Holloway met with an unnamed man at a restaurant in Austin and obtained a key to the aircraft. We cannot determine which individual received the key, although the unnamed man apparently "worked out" various "details for the use of the aircraft" with Holloway. Parks described the man's physical characteristics, but whether this description fit that of Amuni or any other person shown to be

---

3. Nor did they testify at the trial on the merits. Of course, had they testified, their testimony at the suppression hearings could not have been used against them at the trial, except possibly for impeachment purposes. *See Simmons v.* *United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *United States v. Salvucci,* 448 U.S. 83, 93–94, 100 S.Ct. 2547, 2553–54, 65 L.Ed.2d 619, 629 (1980).

connected to the plane is unknown; nor does anything indicate this man's relationship to the plane or its owner or how he came to have the key. Although the agent did not include Parks' statement that the plane was stolen in his report, the trial court in its findings credited the agent's testimony that Parks said this. The agent's report also reflects that Holloway, when told the plane had been reported stolen and he had probably been "set up," replied, "I'm not a snitch. I won't tell on them."[4]

Following the standing hearing, the trial court found Holloway piloted the plane "from" Mexico to the site of arrest on April 27, that Parks was not a passenger on it, and that during the time the beeper was attached Roberson was the plane's registered owner but it was actually owned by Amuni, who was the only person ever observed flying the plane prior to the evening of April 27. The court found Parks "had neither possession nor control of the aircraft and failed to establish that he was ever on the airplane at any time that it was tracked." Regarding Holloway, the court found that although "he possessed the key to a padlock that excluded others from entering the plane" and his "possession of the key to the padlock on the airplane and his piloting of the airplane gave him control and custody of the aircraft on April 27, 1979," nevertheless "he failed to establish that either the registrant or the owner . . . gave him permission to fly it." Although the court stated it "need not decide whether the plane was actually stolen," it determined that because Holloway "offered no evidence that he rightfully possessed and controlled the plane," it was "unable to conclude that any expectation of privacy

created by Holloway's mere piloting of the airplane and possession of a key was the type of legitimate expectation of privacy contemplated by the Court in *Rakas* [*v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)]." Accordingly, finding that neither Parks nor Holloway "had legitimate expectations of privacy in the . . . aircraft," the trial court held neither had standing to challenge the installation or monitoring of the beeper.

## DISCUSSION

We begin our discussion by noting the "merger" of many "standing" and "substantive" issues in Fourth Amendment analysis brought on by *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). *See Rawlings v. Kentucky*, 488 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633, 642 (1980). Under such a merged analysis, *Rakas* informs us that

> "the question is whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." 439 U.S. at 140, 99 S.Ct. at 428.

*Rawlings* capsulates the ultimate single inquiry into "whether governmental officials violated any legitimate expectation of privacy held by" the party seeking to exclude the evidence obtained through the challenged search or seizure. 448 U.S. at 106, 100 S.Ct. at 2562.[5]

---

4. We note that the rules of evidence are considerably relaxed at suppression hearings. *United States v. Matlock*, 415 U.S. 164, 172–76, 94 S.Ct. 988, 993–95, 39 L.Ed.2d 242, 250–52 (1974).

5. The references of *Rakas* to "legitimate expectation of privacy," 439 U.S. at 143–49, 99 S.Ct. at 430–33, are largely made in terms of its analysis of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), which it is said "provides guidance in defining the scope of the interest protected by the Fourth Amend-

ment." 439 U.S. at 143, 99 S.Ct. at 430. The concept of legitimate or reasonable expectation of privacy appears in Justice Harlan's concurring opinion in *Katz*, 389 U.S. at 360–62, 88 S.Ct. at 516–17, but is not expressly stated in Justice Stewart's opinion for the Court. We note, however, Justice Stewart's observation in *Katz* that

> "the Fourth Amendment cannot be translated into a general constitutional 'right to privacy.' That Amendment protects individual privacy against certain kinds of governmental intrusion, but its protections go further,

In this case, however, we find it helpful for analytical purposes and clarity of presentation to refer to the following passages from Justice Blackmun's concurring opinion in *Rawlings*:

"In my view, *Rakas v. Illinois* . . . recognized two analytically distinct but 'invariably intertwined' issues of substantive Fourth Amendment jurisprudence. . . . The first is 'whether [a] disputed search or seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect' . . . ; the second is whether 'the challenged search or seizure violated [that] Fourth Amendment right[ ]' . . . . The first of these questions is answered by determining whether the defendant has a 'legitimate expectation of privacy' that has been invaded by a governmental search or seizure. The second is answered by determining whether applicable cause and warrant requirements have been properly observed.

"I agree with the Court that these two inquiries 'merge into one' . . . in the sense that both are to be addressed under the principles of Fourth Amendment analysis developed in *Katz v. United States* . . . and its progeny. But I do not read today's decision, or *Rakas,* as holding that it is improper for lower courts to treat these inquiries as distinct components of a Fourth Amendment claim. . . . It remains possible for a defendant to prove that his legitimate interest of pri-

vacy was invaded, and yet fail to prove that the police acted illegally in doing so. And it is equally possible for a defendant to prove that the police acted illegally, and yet fail to prove that his own privacy interest was affected." 448 U.S. at 111–12, 100 S.Ct. at 2564–65 (citations omitted) (brackets in original).

Following Justice Blackmun's formulation, we conclude that neither Parks nor Holloway has demonstrated that the installation, maintenance or monitoring of the beeper "infringed an interest of" *his* "which the Fourth Amendment was designed to protect." Hence, we pretermit inquiry into whether the agents acted legally in installing, maintaining, and monitoring the beeper.[6]

In our disposition of the case on the foregoing basis we are also guided by the rule that "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas,* 439 U.S. at 130 n. 1, 99 S.Ct. at 424 n. 1. *See also Rawlings,* 448 U.S. at 104, 100 S.Ct. at 2561.

■ Respecting Parks, the case is clear-cut. No proprietary rights of Parks were invaded, as he had no such rights respecting the plane or any place it was shown to have been; neither was his privacy respecting his own movements invaded, as the beeper tracked only the plane and Parks was never on it.[7] Under these cir-

and often have nothing to do with privacy at all. Other provisions of the Constitution protect personal privacy from other forms of governmental invasion. But the protection of a person's *general* right to privacy—his right to be let alone by other people—is, like the protection of his property and of his very life, left largely to the law of the individual States." 389 U.S. at 350–51, 88 S.Ct. at 510–11 (emphasis in original) (footnotes omitted). So far as we are aware, the Supreme Court has never questioned this passage.

6. We note, however, that since the beeper was affixed to the inside of the plane, and its attachment was effected by the agents' entry into the plane's interior through a closed door, our decision in *United States v. Michael,* 645 F.2d 252 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 950,

102 S.Ct. 489, 70 L.Ed.2d 257 (1981), is not dispositive respecting the pretermitted issues. *See United States v. Cady,* 651 F.2d 290 (5th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982).

7. That the plane evidently carried the marihuana which Parks and Holloway were charged with possessing does not serve to give either of them "automatic standing." *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). Even if they had claimed some character of proprietary right in the marihuana *itself,* this *alone* would not suffice, particularly in light of its contraband character. *Id.* at 91–92. *See Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2256, 65 L.Ed.2d 633 (1980); *United States v. Arce,* 633 F.2d 689, 694 (5th Cir. 1980) *cert. denied,* 451 U.S. 972, 101 S.Ct.

cumstances, it is clear that the installation, maintenance, and monitoring of the beeper invaded no interest of Parks that the Fourth Amendment was designed to protect. *United States v. Whitley*, 670 F.2d 617, 619–20 (5th Cir. 1982).

■ Holloway's situation presents a more difficult problem. Since he was not shown to have any interest whatever in the plane prior to April 27, the entry into the plane and the installation of the beeper did not infringe *his* Fourth Amendment rights.[8] However, our analysis cannot stop here, for the beeper remained in the plane, and continued to provide monitored signals after Holloway acquired a key and commenced piloting the plane. The question then becomes whether, as the district court accurately described it, "Holloway's mere piloting of the airplane and possession of a key" gave rise to an interest on his part that the Fourth Amendment was designed to protect from invasion by the beeper's presence and monitoring.

To resolve this issue we first turn to the question of the legitimacy of Holloway's presence as pilot of the plane and possessor of a key to it. Though *Rakas* rejected the statement in *Jones v. United States*, 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697, 706 (1960), that "anyone legitimately on premises where a search occurs may challenge its legality," nevertheless *Rakas* reaffirms so much of *Jones* as *denies* "standing" to persons whose presence on the searched premises is *not* legitimate. 439 U.S. at 141 n. 9, 99 S.Ct. at 429 n. 9. *See United States v. Reyes*, 595 F.2d 275, 278–79 (5th Cir. 1979). Here the trial court found Holloway had not established that his possession of the plane was legitimate. Although the trial court did not determine

whether or not the plane was stolen, it was not the government's burden to produce proof or convince the court that such a theft had occurred. Rather, it was Holloway's burden to come forward with evidence and persuade the court that his possession was legitimate. Moreover, even if the plane were not stolen, this would not necessarily be inconsistent with Holloway's possession of it being unauthorized.

■ The only evidence on how Holloway came into possession was Parks' post-arrest, out-of-court statements. The district court was not required to credit all that Parks reportedly said, particularly as it found that Parks initially stated the plane was stolen and there were indications the owner had so reported it. Further, the statements of Parks relied on by appellants, even if credited, do not necessarily establish that Holloway's possession was legitimate. Not only is there no evidence that the unidentified man furnishing the key owned any interest in or had any lawful authority over the plane, there is not even any evidence that he ever purported to have any such interest or authority. We do not suggest that evidence of legitimacy of possession or control need be such as to satisfy a title examiner, or that some kind of documentary proof is necessary. However, where the evidence shows that the possessor is not the owner, the mere acquisition of a key from an unidentified third party, who is not shown to have exhibited any other indicia of ownership, possession or authority, will generally be insufficient to require the trial court to find that possession is legitimate. At least this is so where, as here, the evidence fails to show either that other potential sources of proof were explored and found to be unavailable to the posses-

---

2051, 68 L.Ed.2d 351 (1981); *United States v. Pringle*, 576 F.2d 1114, 1118–19 (5th Cir. 1978); *United States v. Perez*, 526 F.2d 859, 863 (5th Cir.), *cert. denied*, 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976). We are not here concerned with whether, or to what extent, the presence of contraband either justifies otherwise improper police conduct or destroys "standing" that would otherwise exist by virtue of a proprietary interest in, or legitimate expec-

tation of privacy concerning, the place where the contraband is located. Rather, our narrow holding here is that a "proprietary" interest in contraband does not *alone* confer "standing" in situations where it would otherwise be lacking.

8. Indeed, defendants do not attack either the January or the March installation of the beeper, or the entries into the plane made in connection therewith.

sor, or that the transaction is of a kind normally conducted in good faith on such a basis. A court should not excuse a defendant's failure to meet his burden at a suppression hearing merely because he may wish to maintain a code of "honor among thieves" or fears reprisal if he neglects to do so. Accordingly, we hold that Holloway failed to carry his burden of proof on the issue of the legitimacy of such possession of the plane as he had; thus, he has not established that his own Fourth Amendment rights were violated. *See United States v. Reyes, supra; United States v. Byers,* 600 F.2d 1130 (5th Cir. 1979).

But even if Holloway had been legitimately piloting the plane and in possession of its key on April 27, any illegality in the maintenance and monitoring of the beeper would not have infringed any interest of his that the Fourth Amendment was designed to protect.

We recognize that *Rakas* "emphatically rejected the notion that 'arcane' concepts of property law ought to control the ability to claim the protections of the Fourth Amendment," *Rawlings,* 448 U.S. at 105, 100 S.Ct. at 2561, and that "the Fourth Amendment protects people, not places," *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967). Nonetheless, property rights clearly continue to play a significant role in Fourth Amendment jurisprudence. Although the Amendment protects people, it does not protect them against everything. Rather, it protects them from violations of "[t]he right . . . to be secure in *their* persons, houses, papers, and effects, against unreasonable searches and seizures." U.S.Const. amend. IV (emphasis added). Justice Rehnquist's opinion for the Court in *Rakas* expressly recognizes that:

"Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society... [B]y focusing on legitimate expectations of privacy in Fourth Amendment jurispru-

dence, the Court has not altogether abandoned use of property concepts in determining the presence *or absence* of the privacy interests protected by that Amendment. No better demonstration of this proposition exists than the decision in *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), where the Court held that an individual's property interest in his own home was so great as to allow him to object to electronic surveillance of conversations emanating from his home, even though he himself was not a party to the conversations." 439 U.S. at 143-44 n. 12, 99 S.Ct. at 430 n. 12 (emphasis added).

To the same effect is the statement in Justice Powell's concurring opinion in *Rakas,* joined in by the Chief Justice:

"And, as the Court states today, property rights reflect society's explicit recognition of a person's authority to act as he wishes in certain areas, and therefore should be considered in determining whether an individual's expectations of privacy are reasonable." 439 U.S. at 153, 99 S.Ct. at 435.

And, our recent opinion in *United States v. Dunn,* 674 F.2d 1093 (5th Cir. 1982), likewise reflects the continuing importance of ownership or proprietary rights in this area. *See also United States v. Vicknair,* 610 F.2d 372, 379-80 (5th Cir.), *cert. denied,* 449 U.S. 823, 101 S.Ct. 83, 66 L.Ed.2d 25 (1980).

█ Where a beeper is illegally present in the interior of a plane, we are reluctant to conclude that this continuing physical intrusion or trespass does not substantially infringe the property rights of the owner or other party having a significant proprietary interest in the plane. But we do not decide the Fourth Amendment implications of such a conclusion, for the evidence did not show that Holloway had any ownership or proprietary rights. Even if his presence on the plane were legitimate, mere legitimate presence, especially in something as mobile as an airplane, does not necessarily confer "standing." *Rawlings v. Kentucky, supra; Rakas v. Illinois, supra; United States v. Reyes, supra.* Nor is Holloway's position in this regard materially enhanced by his pos-

session of a key, again assuming it to be legitimate. *See Vicknair*, 610 F.2d at 380. Although with the key he could have "excluded others from entering the plane," as the district court found, nevertheless we are not here concerned with any entry made while Holloway had the key. *Cf. United States v. Arce*, 633 F.2d 689, 694 (5th Cir. 1980), *cert. denied*, 451 U.S. 972, 101 S.Ct. 2051, 68 L.Ed.2d 351 (1981) (government concedes standing of party driving car at time of its seizure to challenge the seizure and consequent search of the car). Holloway's mere piloting of the plane and possession of a key do not establish that he had any general right or authority to remove items already attached to the plane when he received the key. Moreover, even if he did have some such authority, nothing demonstrates that it would have been even partially for his personal benefit, as opposed to being simply an authority to act on behalf of the owner. We therefore conclude that whatever significance might be given in other contexts to the concept of the beeper constituting a continuing trespass or physical intrusion, it does not suffice to confer "standing" on Holloway.[9]

■ We recognize that *Katz* means that an absence of ownership or proprietary rights is not necessarily fatal to a claim of legitimate expectation of privacy. But surely the nature and extent of the claimed invasion of privacy is relevant in making this assessment. Even without the beeper, the plane was subject to legitimate visual and radar tracking. "The beeper only aided the agents in the performance of their lawful surveillance." *United States v. Michael*, 645 F.2d 252, 258 (5th Cir.) (en banc), *cert. denied*, 454 U.S. 950, 102 S.Ct. 489, 70 L.Ed.2d 257 (1981). It did not serve to disclose the location of the plane in any area from which Holloway had the right to exclude others. Absent an invasion of ownership or proprietary rights, we hold that

neither pilot nor passenger has a legitimate expectation of privacy in the movement of the plane through the public airways.[10] We are not persuaded to a contrary conclusion by Holloway's argument that he not only expected the plane would not be detected, as he flew without lights to a remote spot, but that his expectation was *reasonable* because without the beeper the agents would not have located the plane on this occasion and would be most unlikely to do so on others. However, with more, or more timely, radar and visual tracking this would not be so. In our view, the prevailing level of lawful governmental surveillance of flights in public airways (especially in the vicinity of national borders), which is subject to change without notice, does not constitute a sufficient foundation on which to erect a legitimate expectation of privacy for Fourth Amendment purposes respecting plane movements on such flights.

■ We also observe that here the beeper monitored, and was intended to monitor, only the movements of the plane and not those of Holloway. Holloway was not even known to the agents prior to the plane's landing on the evening of April 27. Having no ownership or proprietary interest in the plane, Holloway had no legitimate expectation of privacy respecting *its* movements through the *public* airways. The beeper did not monitor or disclose anything done, said or present on the plane. Accordingly, we need not determine whether Holloway would have a legitimate expectation of privacy respecting his presence on the plane or matters said or done within the plane while he was piloting it, assuming he was doing so legitimately. *See Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *United States v. Cheshire*, 569 F.2d 887, 889 n. 3 (5th Cir.), *cert. denied*, 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1138 (1978).

---

9. Similarly, we are not dealing with a beeper attached to the clothing or person of a defendant pilot or passenger, where there likewise would be some sort of continuing trespass on or physical invasion of the individual's person or property.

10. We are not concerned with airways immediately adjacent to a private landing strip located on the pilot's or passenger's property.

We believe that the decisions in *United States v. Sheikh*, 654 F.2d 1057, 1071 (5th Cir. 1981); *United States v. Michael, supra; United States v. Reyes, supra; United States v. Cheshire, supra*; and *United States v. Abel*, 548 F.2d 591 (5th Cir.), *cert. denied*, 431 U.S. 956, 97 S.Ct. 2678, 53 L.Ed.2d 273 (1977), support our holding that Holloway's mere piloting of the plane and possession of a key to it, even if proper, do not establish that the presence and monitoring of the beeper in the plane as it moved through the public airways invaded any legitimate expectation of privacy on his part. Though the cited decisions, except apparently for *Reyes*, involve instances where this Court either held or seems to have assumed that the physical presence of the transponder device itself continued to be lawful, which is arguably not true here after April 20, we do not believe that such distinction is determinative in this case. The lawfulness *vel non* of the physical presence of the beeper affects the legitimation of Holloway's expectation of privacy only insofar as such expectation can be said to have a source in his property rights. But Holloway has not established that he had any ownership or proprietary rights sufficient for such purpose. Holloway must accordingly base the legitimation of his expectation of privacy on "understandings that are recognized and permitted by society." *Rakas v. Illinois, supra*. The above-referenced decisions of this Court are persuasive authority that those understandings do not furnish a legitimate expectation of privacy in the movements of an airplane through the public airways.

Accordingly we hold that the installation, maintenance, and monitoring of the transponder did not invade any rights of Holloway that the Fourth Amendment was designed to protect.

The trial court did not err in overruling appellants' motion to suppress. Since no other complaint is made respecting their convictions, the judgment below is affirmed.

AFFIRMED.